# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4422-16T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

RAELITO PALAO, a/k/a
RAEL PALAO,

      Defendant-Appellant.

_____

Argued January 23, 2020 – Decided October 27, 2020

Before Judges Fuentes, Mayer, and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 14-03-0185.

Rochelle Watson, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Rochelle Watson, of counsel and on the briefs).

Ali Y. Ozbek, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Robert J. Wisse, of counsel and on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

A Passaic County Grand Jury returned a six-count indictment charging defendant Raelito Palao with second degree sexual assault of A.E. (Abigail), a child under the age of thirteen, N.J.S.A. 2C:14-2b (Count 1); third degree endangering the welfare of a child - Abigail and V.M. (Valerie), N.J.S.A. 2C:24-4a, (Counts 2 and 6); fourth degree criminal sexual contact of K.D. (Kenzie) and Valerie, N.J.S.A. 2C:14-3b, (Counts 3 and 5); and second degree endangering the welfare of a child - Kenzie, N.J.S.A. 2C:24-4a (Count 4).[1]

Defendant was tried before a jury over four days. The jury found defendant guilty of all the charges listed in the indictment. At the sentencing hearing, the trial judge merged Counts 1 with Count 2 and sentenced defendant to a term of seven years, subject to an eighty-five percent period of parole ineligibility and three years of parole supervision, as mandated by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On the two convictions for third degree endangering the welfare of a child, the judge sentenced defendant to a term of five years, to run consecutive to the sentenced imposed on Count 1. The

---

[1] Pursuant to <u>Rule</u> 1:38-3(c)(12), the three children allegedly sexually molested by defendant are identified only by their initials. The names following their initials are pseudonyms used here in the interest of clarity.

judge also merged Count 5 with Count 6 and sentenced defendant to a term of three years, to run concurrent with Count 4, but consecutive to Count 1.

In this appeal, defendant argues he was denied a fair trial because the trial judge: (1) denied his motion to sever the charges involved in the three separate alleged incidents with three different victims; (2) granted the State's motion to admit prejudicial evidence under N.J.R.E. 404(b); (3) allowed the State to call an expert witness to testify and opine on the reasons why the children did not disclose the alleged sexual molestation sooner based on the now discredited Child Sexual Abuse Accommodation Syndrome (CSAAS); and (4) imposed an unwarranted and legally excessive sentence.

The Supreme Court held in State v. J.L.G. that "CSAAS does not satisfy a basic standard of admissibility -- reliability -- because it is not generally accepted by the scientific community. Expert testimony about CSAAS therefore may no longer be presented to juries."  234 N.J. 265, 308 (2018).  It is now also definitively settled that the Court's holding in J.L.G. must be given pipeline retroactivity.  State v. G.E.P., ____ N.J. ____ (2020) (slip op. at 4).  Based on the record developed before the jury here, we conclude defendant was denied a fair trial by the admission of expert testimony on the applicability of CSAAS. We are thus bound to reverse defendant's conviction and remand this matter for

a new trial.

I

THE CASE INVOLVING ABIGIAL

In her opening statement to the jury, the prosecutor proffered that defendant began sexually molesting Abigail in the Spring of 2013, when she was eleven years old. The abuse was discovered when Abigail, while hiding in the bathroom of her home, texted to a friend: "There's a perv in my house. He's my father's friend. I'm scared." Although this electronic message was meant to be read only by another child, Abigail's father inadvertently discovered it. According to the prosecutor, this

> disclosure would spread through a very tightknit church community that both [Abigail] and her family and . . . defendant belonged to, and it was her disclosure that ultimately was passed down to two other girls by the names of [Kenzie] and [Valerie], who were at the time young adults when they heard about [Abigail].

Abigail was the first witness to testify at trial. At the time she testified, Abigail was fifteen years old and attending the tenth grade of high school. She resided with her parents, her younger brother and sister, and her grandmother. Her family are members of the Bible Church International (BCI). She has been a member of BCI since she was five years old and attends services on weekends. Abigail testified that she knew Valerie and Kenzie as youth leaders at BCI. She

A-4422-16T4

was particularly close to Valerie.

Abigail first met defendant when she was approximately six years old. She characterized her family's relationship with him as a "casual friendship." Her initial interactions with him were during family children's parties. As she grew up, defendant became more of a close family friend. She thus called him by a Filipino word which she explained meant "uncle in Filipino, but usually it's a sign of respect for anyone older than me." Although defendant left BCI at one point, he continued his association with Abigail and her family.

Abigail testified she was about eleven years old the first time defendant sexually molested her in the basement of her own home.

> PROSECUTOR: Okay, and what was it that happened between you and Mr. Palao?
>
> ABIGAIL: There was an incident where he went to our house to -- we had just moved in, and he went to our house to visit or to look around, because a lot of people were doing that since we had just gotten it, so I assumed that it was just another person that wanted to see it. And we were in the basement of my house and, while I was playing a video game on my laptop desk downstairs, and he came downstairs and I assumed that he was just going to look around to see the basement and he came up behind me and touched my breast under my shirt, under my bra.

Abigail testified that defendant did not say anything or even acknowledge when she said "no" and told him to stop. She said the incident lasted "maybe a

A-4422-16T4

few seconds" and he finally stopped when she pushed him away. She thereafter took refuge in the bathroom, where she remained for approximately thirty to forty minutes. Defendant had left the house by the time she came out of the bathroom. Abigail testified she did not say anything to her parents about defendant's behavior at that time because she was "scared or embarrassed of what they would say."

The second incident occurred one year later in the bedroom Abigail shared with her younger sister, who was about five years old at the time. Abigail testified that defendant came into the bedroom and "started like playing with me . . . tickling me around my stomach, on like the sides, he was poking my sides, and then all of a sudden he put his hand on my vagina." The second incident also lasted "a few seconds[.]" She again told him "no . . . stop" and pushed him away. When the prosecutor asked her how it ended, she stated: "When I was pushing him away and telling him to stop, all of a sudden he did and he just left the room."

In response to defense counsel's questions on cross-examination, Abigail admitted that the guidance counselor in her school accused her of hacking into another person's social media account and "posting nasty information about another person in [her] class." Abigail also confirmed that the guidance

A-4422-16T4

counselor told her she was facing suspension from school.  When her father found out about this incident in school, he became very angry.  This prompted him to go through Abigail's electronic device and discover the message she sent to her friend purportedly documenting the first time defendant sexually molested her.

The following exchange illustrates defense counsel's line of questioning concerning this issue:

> Q. In that text message, you refer to someone as a pervert.
>
> A. Yes.
>
> Q. Your father asked you who you were referring to as a pervert.
>
> A. Yes.
>
> Q. From that moment on, the focus was no longer on the Instagram issue and your suspension in school; it was on the pervert text message.
>
> A. Yes.
>
> Q. You didn't mention the name, "Raelito Palao," in that text message.
>
> A. No.
>
> Q. Your father in fact suggested that [defendant] was the pervert.

A. He didn't suggest it. He was -- I was -- I was the one that told him who it was, but he didn't suggest that it was him.

Abigail's father, N.E., also testified as a witness for the State. He identified himself as a "born-again Christian" and a congregant of BCI since about 2005. He has known defendant since 2006. Prior to this incident, N.E. considered defendant a friend "close enough that I took him as one of my godfather [sic] for my daughter." N.E. testified that defendant visited his home "unannounced" on two separate occasions; the first time was in the summer of 2012 and the second in the spring of 2013. N.E. provided the following account of what transpired during defendant's second visit.

> I went to the basement to get the air condition, because before we went for dinnertime I was putting . . . air condition to every room, and that's why I went to the basement to get that air conditioner.
>
>     . . . .
>
> I went to [Abigail's] bedroom with the air condition.
>
>     . . . .
>
> I was holding onto the air condition, went to . . . [Abigail's] room.
>
>     . . . .

I saw [defendant] in . . . [Abigail's] room and he was playing [with] [Abigail], you know, touching her, and I said, "What are you doing?"

. . . .

I put down the . . . air condition[er] and I told him to get out of her room.

## THE CASE INVOLVING VALERIE

Valerie was twenty-four years old when she testified before the jury in this case. Her family consists of her parents and three brothers. At the time of trial, she resided with her parents and two younger brothers. Her father is a coworker of Abigail's father and a Deacon of the BCI church. Her family has belonged to BCI since she was two years old. Valerie testified that BCI was a central part of her family's social and spiritual life. She described BCI members "as a close-knit community . . . we know all the members, so it's like a family."

Her parents considered defendant as a friend of the family. "They would talk to each other at church and also he was always invited to our house through my parents. So it was very mutual. They were very close with him." Valerie testified that during childhood, defendant was known as "The Tickle Monster." But he was also called "Pastor." According to Valerie, although defendant was not "technically" a pastor, "he received that title because, when our church first

started, our pastor -- our head pastor spoke in Tagalog[2] in our language through messages, and he would translate into English."

As a child, Valerie respected defendant and viewed him as an "uncle." Her relationship with him changed when she experienced certain encounters that made her feel "uncomfortable." Valerie testified that defendant would "touch [her] in places where [she] felt uncomfortable and inappropriate." She provided the following account in response to the prosecutor's request for specificity:

> For example, he would come to my house and he would embrace me from behind, and I couldn't let go, and then he would reach his . . . hand underneath my shirt and underneath my bra and would try to fondle my breast. And then I would try to let go, tell him to stop, and then he would try to put his hands underneath my pants. But he would be unsuccessful, because I would -- with all my might I would scream and say, "Stop," or call my -- whoever's in the house and try to let go of him.

According to Valerie, defendant began to sexually molest her in this fashion when she was "about in 8th grade to freshman year in high school." She testified that defendant sexually molested her in this fashion "about nine [to] ten times." The abuse would occur when she was at home alone or when "certain

---

[2] Tagalog is the native language of the people of the Philippines.

members of my family would be home[.]"[3]  When the prosecutor asked Valerie

why she did not disclose defendant's misconduct earlier to her parents, she

provided the following explanation:

> Since I was that young, I was scared, because growing up I kind of didn't want to disrupt what my parents built for us, because they came from the Philippines, so they wanted to essentially give us a better life here in America, and things like this we don't speak about in our household.  So when this happened I kind -- I didn't want to tell them.  And so when . . . [Abigail's] case came up, I knew I just had to tell them.

She testified that her father told her about Abigail's allegations in June

2013, when she was twenty-one years old.  On cross-examination, the defense

established that as a "youth leader" at BCI, Valerie led discussions in groups

made up of young people.  As Valerie explained:

> [W]e have youth nights every Friday night, and . . . the youth pastor, he says a short message in the evening, and then the youth leader breaks off into different smaller groups of . . . kids.  So the youth group is from middle school to high schoolers, so youth leader, their role is to counsel or to guide the conversation after the message that the youth pastor gave that night.

---

[3]  Valerie described a particular incident in which the only family members who were home when defendant sexually molested her were her younger brothers, who were six and eight years old at the time.  She did not recall whether her parents were home during any other incident.

A-4422-16T4

The BCI youth groups Valerie described consisted of three to seven adolescents and met almost every Friday, depending on what "the youth pastor decides in terms of the curriculum for the month." Abigail participated in youth groups since she was in sixth or seventh grade, although not directly under Valerie's supervision. Valerie acknowledged, however, that she had "a big sister-little sister relationship" with Abigail within the church. Against this backdrop, defense counsel pursued the following line of inquiry:

> Q. Now, your father told you that [Abigail] had accused [defendant] of touching her inappropriately?
>
> A. Yes.
>
> Q. And your father told you that [Abigail] said [defendant] lifted up her shirt.
>
> A. Correct.
>
> Q. And your father then said, "Did [defendant] do anything like that to you?"
>
> A. Correct.
>
> Q. And, when you heard [Abigail's] allegation, you were angry.
>
> A. Yes.
>
> Q. And one of the words that you used was, "Shocked."
>
> A. Mmm-hmm.

12

> Q. Now, you decided that you wanted to help
> [Abigail][?]
>
> A. Uh --

In the course of this line of inquiry by defense counsel, Valerie reaffirmed that she provided the Clifton Police detectives who interviewed her complete and accurate details of her own sexual molestation by defendant, which included: (1) where these incidents occurred: (2) when they occurred; and (3) who was around when they occurred. Valerie also maintained that she was equally candid and truthful when she was interviewed by detectives from the Passaic County Prosecutor's Office (PCPO). However, she admitted that she did not tell the PCPO detectives that defendant had come to her house "claiming he was hungry or thirsty" at a time her parents were not home.

Valerie also testified that she referred to defendant as "The Tickle Monster" when she was a prepubescent girl between the ages of two to twelve years old. During this time period, Valerie testified that all of the children in BCI called defendant "The Tickle Monster" because he would run around to tickle them, and they would scream. Valerie admitted "this was a common occurrence." Defense counsel then asked Valerie the following questions:

> Q. At some point you got older; you weren't two
> anymore; you became a teenager; you became 13 years
> old, right?

A. Correct.

Q. And [defendant] would still try to tickle you, right?

A. Yes.

Q. And you would tell him to stop?

A. Yes.

Q. And he would still try to tickle you.

A. Mmm-hmm.

Q. He would tickle you on your stomach?

A. It was usually underneath my armpits.

Q. And -- so on the side of your body he would tickle you?

A. Yes.

Q. And he would tickle you on your ribs too?

A. Um --

Q. Like underneath your armpit?

A. Yeah, underneath my armpit.

Q. And, when he started to do that when you were 13 or 14 years old, you didn't refer to him as, "The Tickle Monster," anymore, right?

A. Right.

14

Q. You referred to him as a creep.

A. Correct.

In an effort to impeach Valerie's credibility, defense counsel noted that from 2007 to 2012, she did not tell anyone about defendant's sexual molestation. In his closing argument to the jury, defense counsel emphasized that if Valerie's testimony was true, she knowingly permitted a sexual predator to remain an active member of the BCI community for over five years.

THE CASE INVOLVING KENZIE

Kenzie was twenty-four years old at the time she testified in this trial on October 11, 2016. The State presented her testimony to prove defendant sexually molested her between September 1, 2005 and August 31, 2007. Her family were active members of BCI and she attended religious services with her family as a child every Sunday. Her participation in BCI activities also included "youth camp, church camping events, [and] Bible studies." However, Kenzie stopped attending BCI religious services "around 2011, 2012."

Kenzie is the same age as Valerie; the two grew up together as "best friends." When asked to elaborate, Kenzie testified: "I would see her every week, like, at church and we'd hang out on the weekends or we'd have, like, play dates growing up." Their families were also close friends and members of the

BCI community. Kenzie testified that her family was "acquainted" with Abigail's family as part of the BCI community. Kenzie first met defendant and his family when she was "around" six or seven years old. She referred to defendant as Pastor [R.] because she "believed he was, like, a pastor in the Philippines and we respected our elders, so . . . he was known as a pastor, but not a pastor of Bible Church International."

Kenzie testified that she "looked up" to defendant and saw him as an "uncle figure." The prosecutor followed up on this line of questioning:

> Q. Okay. And what was it about him that led you to look up to him?
>
> A. Well, he was, like, nice to me. He . . . would take me around, get me Dunkin' Donuts and buy me, like, treats and gifts.
>
> Q. What sort of things would he buy for you?
>
> A. Well, like, at Dunkin' Donuts . . . drinks, he'd get me, like, games, toys . . . Nintendo DS, he got me a cell phone, and he would give me money sometimes.
>
> Q. And how did you feel when he gave you these things?
>
> A. I was happy. I liked getting free things as a child.
>
> Q. Do you remember when -- how old you were when he first started to give you things?
>
> A. Around 13-14 [years old].

16

According to Kenzie, defendant began spending more time with her when she reached the age of fourteen. He offered to drive her to Bible study classes at the church. Because her parents were working, they "were okay with it." Kenzie testified defendant drove a black Ford "SUV type" vehicle. She always sat in the front passenger seat. Kenzie testified that defendant worked for Cablevision at the time; he told her he could probably get her a summer job there. She enjoyed driving around with defendant because he would give her "food, money, [and] gifts."

However, something happened one day that fundamentally changed the tenor of their relationship.

> During these car rides, when he'd be either bringing me to church or driving me around for work, he -- while he was driving, I'd be in the front seat and he'd out of nowhere use his, like, right hand forcefully put his hand by my vagina area and my breast area and he'd be touching me, like, with his hands, moving it all around with his fingers and he'd, like, go -- like, touch my skin at the -- with -- under the waistband. And he would also, like, be pinching and grabbing my breasts.
>
> Q. Okay. And now did this -- did the incident happen one time or was this more than one time?
>
> A. It happened more than one time.
>
> Q. Do you remember approximately how many times something like this happened with [defendant]?

A. Approximately 40 times.

Although she could not remember "a specific date," Kenzie testified that whenever it happened, she would ask him to stop. She also claimed that defendant commented on her then teenaged body by saying: "your boobs are tiny," or "you have no . . . ass." She would typically tell him "stop it . . . stop it[.]" According to Kenzie, he would just smile and keep doing it, "then eventually he would . . . just stop." Despite these repeated incidents of sexual abuse by defendant, Kenzie testified that she continued to spend time with defendant because:

> I really liked when he gave me, like, gifts, like the cell phone, money, and he would treat me out. And I didn't know as a child that him touching me and tickling me in those areas [was] wrong. I didn't know what molesting was at that age and I – I knew it felt uncomfortable, but I didn't know it was a crime of any sort.

Kenzie also described a particular incident in which she and K.H., a friend from school, went to the Garden State Plaza Mall with defendant. Kenzie testified she asked defendant for a ride to the mall because

> [K.H.] was one of my best friends[4] and . . . we had wanted to hang out and, like, go to the mall and, like,

---

[4]  In response to the prosecutor's question, Kenzie clarified that K.H. was also fourteen years old when defendant took her and Kenzie to the mall.

buy stuff, and so I knew, like, [defendant] would provide a ride for us, and so I invited her to come along to go to the mall.

During the trip, Kenzie sat in the passenger seat and K.H. sat in the backseat. Kenzie testified defendant purchased bracelets from the Hot Topic store for her and K.H. They then went to Victoria Secret. According to Kenzie, while in Victoria Secret, defendant offered to buy the girls underwear. K.H. accepted the offer and allowed defendant to buy her "[s]everal pairs of underwear." Kenzie declined defendant's offer.

Kenzie testified the sexual abuse eventually stopped because she "eventually . . . grew tired of him tickling and touching me, so . . . I stopped seeing him[.]" Defendant also stopped giving her gifts. Although they never directly discussed the topic, Kenzie claimed that her and Valerie had a mutual unspoken understanding of what defendant did to them. After Valerie told her what happened to Abigail, Kenzie testified that she finally spoke openly with Valerie about what happened to them when they were children. They decided to jointly disclose what they knew to the police.

PCPO Detectives Sergeant James M. Stolz and Sabrina C. McKoy investigated the allegations of sexual abuse made by the three complaining witnesses, Abigail, Kenzie, and Valerie. On June 13, 2013, Kenzie and Valerie

gave sworn statements that described in detail defendant's alleged sexual molestation. However, because the sworn statements provided by these two complaining witnesses are not part of the appellate record, we have opted to rely exclusively on their trial testimony.


II

CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME

Over defendant's objection, the State called Dr. Anthony Vincent D'Urso, a licensed clinical psychologist, as an expert witness. During voir dire direct examination, the prosecutor inquired into Dr. D'Urso's educational background to establish the witness' specialized knowledge under N.J.R.E. 702. Dr. D'Urso testified that he received his doctorate degree in psychology from the Graduate School of Applied and Professional Psychology at Rutgers University. He received his bachelor's and master's degrees in psychology and counseling from Seton Hall University.

At the time he testified in this case, Dr. D'Urso was the section chief and supervising psychologist at the Audrey Hepburn Children's House, and had been practicing clinical psychology for a total of twenty-six years. He holds a similar position at the Metropolitan Regional Diagnostic Center. Dr. D'Urso described

A-4422-16T4

this institution "as a state-mandated regional diagnostic center" where cases of alleged child sexual abuse are referred for psychological and medical services. Focusing on the "diagnostic" aspect of the facility, the prosecutor asked the witness "to explain a little bit more" about this part of its function. According to Dr. D'Urso:

> [T]he four centers, we are supposed to provide medical and psychological services for kids and families <u>where abuse has occurred or alleged to have occurred</u>. That includes the -- anything from physical examinations to post-physical treatments. We also have mental health services . . . [and] evaluations to establish what kids need, what kids and their families need, and we provide the therapy that is sometimes required.
>
> [(Emphasis added)].

He co-authored the State of New Jersey's guidelines on how to conduct clinical assessments of children who had suffered sexual abuse. Dr. D'Urso testified that he has been involved in the clinical and research area of child sexual abuse since 1982. Against this backdrop, the prosecutor asked Dr. D'Urso if he was familiar "with something called the Child Sexual Abuse Accommodation Syndrome?" He answered "yes." This opened the door for the following exchange:

> Q. And approximately how many times have you testified as an expert in this field?

A-4422-16T4

A. In Child Sexual Abuse Accommodation Syndrome?

Q. Yes.

A. Over the last 30 years, probably 250 times.

At this point, the State moved to admit Dr. D'Urso as an expert witness "in the area of Child Sexual Abuse Accommodation Syndrome." This prompted the following line of inquiry from defense counsel:

> Q. Doctor, what courses have you taken in the area of Child Sexual Abuse Accommodation Syndrome?
>
>     . . . .
>
> A. If you're referring to a, like, a -- when you say course, rather than a workshop or training, there are no such courses.
>
>     . . . .
>
> Q. So, there are no courses in the area in which you're being offered as an expert for?
>
> A. Well, again I'm not trying to quibble with the word course. We -- I run a grant on forensic interviewing and we teach prosecutors, caseworkers, detectives to interview kids forensically, and I teach the segment of the class on Child Sexual Abuse Accommodation Syndrome. So, it's not [a] course -- it's a training program for a week, it's not a course.
>
> [(Emphasis added)].

A-4422-16T4

Through a series of questions, defense counsel adroitly identified the scientific frailties and legal concerns the Supreme Court recognized in J.L.G. Defense counsel objected to the admission of Dr. D'Urso as an expert witness in CSAAS. The trial judge overruled defense counsel's objection and provided the following explanation to the jury in support of his decision:

> Okay. I am going to accept the doctor as an expert in the area of Child Sexual Abuse Accommodation Syndrome. The evaluation of the testimony is going to be entirely up to you.
>
> And I am now going to give you some legal instructions before the doctor begins his testimony.
>
> All right. Ladies and gentlemen, again, I am going to give you a legal instruction regarding both expert testimony in general and then as to the specific topic of Child Sex [sic] Abuse Accommodation Syndrome. Now, first, it's going to address just general expert testimony.
>
> [At this point, the trial judge gives the jury the model charge on how to evaluate the testimony of an expert witness.]
>
> I'll now, ladies and gentlemen, instruct you as to how to evaluate testimony regarding the Child Sexual Abuse Accommodation Syndrome. Our law recognizes that stereotypes about sexual assault complaints may lead some of you to question an alleged victim's credibility based solely on the fact that she did not complain about the alleged abuse earlier.

I note, ladies and gentlemen, that there are three alleged victims in this case and you consider the counts as to each alleged victim separately. You may or may not conclude that her testimony -- again, you consider this testimony as to each of the three alleged victims here – is untruthful based only on her silence slash delayed disclosure. You may consider the silence slash delayed disclosure, along with all other evidence, including her explanation for her silence slash delayed disclosure, in deciding how much weight, if any, to afford to complainant's testimony. You may also consider the expert testimony that will explain that silence slash delay is one of the many ways in which a child may respond to sexual abuse.

Accordingly, your deliberations in this regard should be informed by the testimony which will be presented regarding the Child Sexual Abuse Accommodation Syndrome.

I note, ladies and gentlemen, that the expert does not testify specifically about the case before you, nor does he offer any opinion about it. The expert testifies about the Child Sexual Abuse Accommodation Syndrome. Now, you may recall evidence that each of the three alleged victims explained why she did not report the alleged abuse earlier. In this respect, Dr. D'Urso will testify on behalf of the [S]tate. Again, this witness has been qualified as an expert as to the Child Sexual Abuse Accommodation Syndrome. You may only consider the testimony of this expert for a limited purpose, as I will now explain.

You may not consider Dr. D'Urso's testimony as offering proof that child sexual abuse occurred in this case. The Child Sexual Abuse Accommodation Syndrome is not a diagnostic device and cannot determine whether or not abuse occurred. It relates only

24

to a pattern of behavior of a victim which may be present in some child sexual abuse cases. You may not consider expert testimony about the Accommodation Syndrome as proving whether abuse occurred or did not occur. Similarly, you may not consider that testimony as proving, in and of itself, that an alleged victim in this case was or was not truthful.

Dr. D'Urso's testimony may be considered as explaining certain behavior of the alleged victim of child sexual abuse. As I just stated that testimony may not be considered as proof that abuse did or did not occur. <u>The Accommodation Syndrome, if proven, may help explain why a sexually abused child may delay reporting</u>.

Now, to illustrate, in a burglary or theft case involving an adult property owner, if the owner did not report the crime for several years, your common sense might tell you that the delay reflected a lack of truthfulness on the part of the owner. In that case, no expert would be offered to explain the conduct of the victim, because that conduct is within the common experience and knowledge of most jurors. Here, again, as I've indicated, Dr. D'Urso will testify as to this syndrome. This testimony is being admitted only to explain that the behavior of the alleged victims was not necessarily inconsistent with sexual abuse.

Now, the weight to be given to Dr. D'Urso's testimony as to this syndrome is entirely up to you. You may give it great weight, slight weight, or any weight in between, or you may in your discretion reject it entirely.

Ladies and gentlemen, again, you may not consider the expert testimony as in any way proving that the defendant committed or did not commit any particular act of abuse. Testimony as to the Accommodation

Syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse.

And again, ladies and gentlemen, as I have explained to you in the past and will again explain to you, the burden of proof is always upon the [S]tate. The defendant in a criminal case has no burden of proof.

[(Emphasis added).]

With these instructions as backdrop, the prosecutor proceeded to question Dr. D'Urso about CSAAS and how to detect the "clinical findings or clinical symptoms that tend to occur" when a child does not disclose sexual abuse in a timely fashion.

PROSECUTOR: And so, if you have no knowledge of this case, what is the purpose of your testimony here today?

DR. D'URSO: The purpose of Child Sexual Abuse Accommodation Syndrome testimony is to provide information about how kids disclose abuse and why there -- what there are, if any, differences between adult and child sexual assault, because it may seem illogical or not consistent that a child victim may act in a different way. So, the idea is to talk about the landscape of child dynamics and how that would differ to assist the jury in understanding about child sexual assault.

When asked how the "syndrome" is characterized, Dr. D'Urso identified "five sequences that occur in the disclosure process." According to Dr. D'Uro, the first factor is secrecy. Without citing to any authoritative study, Dr. D'Urso

affirmed: "There is no credible study in the world that says kids typically tell after the first time they're engaged in sexualized behavior. It is one of the few findings that is unchallenged in all of child abuse."

Dr. D'Urso testified that the second factor of this syndrome is "helplessness," which he defined as: "the things that occur within the child that inhibit them from telling . . . there are things inside the child which cause them not to tell and then there things outside the child that cause them not to tell." He identified the "outside things" as the "third area, which is coercion, entrapment or accommodation." Dr. D'Urso referred to incomplete disclosure as a "piecemeal process . . . because kids are not likely and typically don't tell everything that happened to them in their first interview . . . they're going to tell more as time goes on." Finally, the fifth factor or "area" of the syndrome is "retraction or recantation."

The prosecutor relied on Dr. D'Urso's expert testimony in her closing argument to provide the jurors a scientifically valid basis to dispel any lingering doubts they may have had related to: (1) the time it took for these three alleged victims to disclose the sexual molestation; and (2) defendant's status within the BCI community.

> Now you also had the opportunity to hear from Dr.
> Anthony D'Urso in this case. And as he mentioned, he

wasn't here to prove to you whether or not any of these girls were sexually assaulted. <u>He was simply here to explain to you why there is a delay in disclosure and how cultural factors, how the relationship of the abuser to the victim can have a role in how that person perceives the abuse and why they may or may not feel comfortable in coming forward.</u> So when you consider their testimony, you can either accept or reject Dr. D'Urso's explanations of the ways in which victims internalize and react to abuse.

[(Emphasis added).]

III

Against this factual backdrop, defendant raises the following arguments in this appeal.

POINT I

THE TRIAL COURT'S DENIAL OF DEFENDANT'S MOTION FOR SEVERANCE IS REVERSIBLE ERROR BECAUSE THERE WAS NO VALID REASON FOR JOINING CHARGES OF INAPPROPRIATE SEXUAL TOUCHING FROM THREE VICTIMS IN ONE TRIAL, AND THERE WAS NO LIMITING INSTRUCTION PROHIBITING THE JURY FROM USING THE JOINED OFFENSES AS EVIDENCE OF DEFENDANT'S PROPENSITY TO COMMIT SEXUAL OFFENSES OR TO IMPROPERLY BOLSTER THE TESTIMONY OF EACH VICTIM.

POINT II

OTHER-BAD-ACT EVIDENCE THAT DEFENDANT HAD PURCHASED UNDERWEAR FOR A

FOURTEEN-YEAR-OLD GIRL, WHO IS NOT ONE OF THE VICTIMS IN THIS CASE, WAS INADMISSABLE PROPENSITY EVIDENCE.  THE ADMISSION INTO EVIDENCE OF THE PAIRS OF UNDERWEAR AND THE STATE'S ENCOURAGEMENT TO THE JURY TO EXAMINE THEM DURING DELIBERATION, COMPOUNDED THE PREJUDICE TO DEFENDANT.

POINT III

EXPERT TESTIMONY ABOUT CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME WAS NOT BASED ON RELIABLE SCIENCE, WAS IRRELEVANT, AND WAS UNDULY PREJUDICIAL.  ITS ADMISSION NECESSITATES REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT IV

A RESENTENCING IS WARRANTED BECAUSE THE TRIAL JUDGE'S QUALITATIVE ASSESSMENT OF AGGRAVATING FACTORS 3 AND 9 AND MITIGATING FACTOR 11 WAS FLAWED.

As we made clear at the start of this opinion, the Supreme Court's holding in J.L.G. unequivocally rejected the scientific validity of CSAAS.  In G.E.P., the Court declared its holding in J.L.G. has pipeline retroactivity.  Thus, the presentation of expert testimony to the jury based on the now discredited CSAAS constituted reversible error.  J.L.G., 234 N.J. at 308.

In G.E.P., the Supreme Court carefully analyzed the four consolidated

cases addressed by the opinion and concluded the convictions of the defendants R.P., C.P., and C.K. could not stand. Writing for the Court, Justice Solomon noted:

> Aside from the CSAAS evidence presented, these cases were based largely upon the testimony . . . [of the] alleged victims. CSAAS testimony bolstering the alleged victims' testimony was "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached," State v. Jordan, 147 N.J. 409, 422 (1997) (quoting State v. Macon, 57 N.J. 325, 336 (1971))[,] and therefore was clearly capable of producing an unjust result as to R.P., C.P., and C.K. Their convictions were thus properly reversed by the Appellate Division.[5]
>
> [G.E.P., ____ N.J. at ____, (slip op at 36) (emphasis added).]

We reach the same conclusion in this case. Dr. D'Urso testified that in the past thirty years, he had been admitted as an expert witness in CSAAS in over 250 judicial proceedings involving child sexual abuse. The introduction of CSAAS evidence through Dr. D'Urso's expert testimony had the capacity of bolstering the credibility of the three complaining witnesses. This alone is sufficient to raise a reasonable doubt about the reliability of the jury's verdict.

---

[5] State v. G.E.P., 458 N.J. Super. 436 (App. Div. 2019).

We are thus compelled to reverse defendant's convictions and remand this matter for a new trial.

In this light, we must also address defendant's argument that the trial court erred by denying his motion to sever the charges related to the three complaining witnesses and admitting the testimony of Kenzie's friend K.H., regarding defendant's decision to buy her underwear at Victoria Secret. Defendant argues that these decisions were highly prejudicial and constituted reversal error. The State argues that both of these decisions constituted a proper exercise of the judge's discretionary authority. We agree with the State.

Pursuant to Rule 3:7-6

> [t]wo or more offenses may be charged in the same indictment or accusation in a separate count for each offense if the offenses charged are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan. Relief from prejudicial joinder shall be afforded as provided by R. 3:15-2.
>
> [(Emphasis added).]

Here, the offenses charged in the indictment are of "similar character," and therefore, joinder was proper under Rule 3:7-6. The issue that remains is whether the trial court should have granted defendant's severance motion based on Rule 3:15-2(b), which provides

> [i]f for any other reason it appears that a defendant or the State is prejudiced by a permissible or mandatory joinder of offenses or of defendants in an indictment or accusation the court may order an election or separate trials of counts, grant a severance of defendants, or direct other appropriate relief.

Generally, "[a]lthough joinder is favored, economy and efficiency interests do not override a defendant's right to a fair trial." State v. Sterling, 215 N.J. 65, 72 (2013) (citing State v. Coruzzi, 189 N.J. Super. 273, 298 (App. Div. 1983) ("The interests of economy and efficiency may require that similar or related offenses be joined for a single trial, so long as the defendant's right to a fair trial remains unprejudiced.")). Therefore,

> [t]he relief afforded by Rule 3:15-2(b) addresses the inherent "danger[,] when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all."
>
> [Ibid. at 73 (quoting State v. Pitts, 116 N.J. 580, 601 (1988)).]

In assessing the prejudice, the trial court must determine whether the separate crimes charged in the indictment have a sufficient nexus to each other such that they would be otherwise admissible in separate trials pursuant to N.J.R.E. 404(b). Ibid. "If the evidence would be admissible at both trials, then

32

the trial court may consolidate the charges because 'a defendant will not suffer any more prejudice in a joint trial than he would in separate trials.'" State v. Chenique-Puey, 145 N.J. 334, 341 (1996) (quoting Coruzzi, 189 N.J. Super. at 299).

When a trial court engages in a N.J.R.E. 404(b) analysis, "[e]vidence relating to other crimes is handled with particular caution." State v. Reddish, 181 N.J. 553, 608 (2004).  As our Supreme Court noted in Reddish:

> "other crime evidence has a unique tendency to turn a jury against the defendant," State v. Stevens, 115 N.J. 289, 302 (1989), and poses a "distinct risk" of distracting the jury from "an independent consideration of the evidence that bears directly on guilt itself.," State v. G.S., 145 N.J. 460, 468 (1996) (citing Stevens, 115 N.J. at 302).
>
> [Ibid.]

N.J.R.E. 404(b) is a rule of exclusion.  State v. Marrero, 148 N.J. 469, 482-83 (1997).  As such, it provides that:

> evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
>
> [N.J.R.E. 404(b) (Emphasis added).]

33

In an effort to "avoid the overuse of extrinsic evidence," the Supreme Court established the following four-part test in State v. Cofield, 127 N.J. 328, 338 (1992) to determine whether the evidence should be admitted under N.J.R.E. 404(b):

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.

If the evidence passes the scrutiny of the Cofield test, the trial court must give the jury limiting instructions to ensure the proper application of the bad conduct evidence. State v. Garrison, 228 N.J. 182, 200-201 (2017). The trial court "should state specifically the purposes for which the evidence may be considered and, to what extent necessary for the jury's understanding, the issues on which such evidence is not to be considered." Stevens, 115 N.J. at 309.

Here, neither the second nor third prong are at issue. The Court has also emphasized that the second prong of the Cofield test should not have universal application. State v. Williams, 190 N.J. 114, 131-34 (2007); see also State v.

34

Skinner, 218 N.J. 496, 515 (2014) (declining to apply the second prong of the Cofield test).[6]   Furthermore, the third prong requires clear and convincing competent evidence, which by definition excludes reliance on incompetent hearsay.  State v. Ingenito, 87 N.J. 204, 220 (1981) (Schreiber, J., concurring).

"To satisfy the first prong of the Cofield test, the 'proffered evidence must be relevant to a material issue genuinely in dispute.'" Garrison, 228 N.J. at 194 (quoting State v. Gillispie, 208 N.J. 59, 86 (2011)).  Relevant evidence is defined as "evidence having the tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. "In determining whether [N.J.R.E.] 404(b) evidence bears on a material issue, the [c]ourt should consider whether the matter was projected by the defense as arguable before trial, raised by the defense at trial, or was one that the defense refused to concede." State v. P.S., 202 N.J. 232, 256 (2010).

This type of evidence is especially important if it is "critical to the establishment of the truth as to a disputed issue . . . where the prosecution's

---

[6] In Cofield, the issue was whether subsequent incidents of drug dealing were admissible to establish defendant's possession of illegal drugs in the charged offense. 127 N.J. at 330. The Court reasoned that the second prong of the Cofield was important there because of the generic nature of drug transactions. 127 N.J. at 337.

access to significant information is limited." State v. Krivacska, 341 N.J. Super. 1, 39 (App. Div. 2001). Additionally, our Supreme Court has noted:

> [i]n criminal prosecutions, New Jersey courts generally admit a wide range of evidence when the motive and intent of the accused is material. State v. Roger, 19 N.J. 218, 228 (1955). That includes evidentiary circumstances that "tend to shed light" on defendant's motive and intent or which "tend fairly to explain his actions," even though they may have occurred before the commission of the offense. Ibid.
>
> [State v. Covell, 157 N.J. 554, 565 (1999).]

The fourth prong of the Cofield test is considered the most difficult to overcome. State v. Rose, 206 N.J. 141, 160. N.J.R.E. 404(b) "'seeks to strike a balance between the prejudice to a defendant that is inherent in other-crime evidence and the recognition that the evidence may be highly relevant to prove a defendant's guilt of the crime charged.'" Id. at 159 (quoting State v. Barden, 195 N.J. 375, 388 (2008)). Therefore,

> evidence of uncharged misconduct would be inadmissible if offered solely to prove the defendant's criminal disposition, but if that misconduct evidence is material to a non-propensity purpose such as those listed in [N.J.R.E.] 404(b), it may be admissible if its probative value is not outweighed by the risk of prejudice.
>
> [Ibid.]

This inquiry "necessitates a more searching inquiry than that required by N.J.R.E. 403." Reddish, 181 N.J. at 608. Under N.J.R.E. 403(a), "relevant evidence will be precluded only if the risk of undue prejudice substantially outweighs its probative value." Ibid. However, "[w]ith respect to other crimes evidence . . . the potential for undue prejudice need only outweigh probative value to warrant exclusion." Ibid.

Thus, due to its potential for misuse, "in determining the probative worth of other-crime evidence, 'a court should consider . . . whether its proffered use in the case can adequately be served by other evidence.'" Marrero, 148 N.J. at 482 (quoting Stevens, 115 N.J. at 303). Stated differently, "[a]n important factor in weighing the probative value of other-crime evidence is whether other, less-inflammatory evidence can prove the same fact in issue." State v. Oliver, 133 N.J. 141, 151 (1993).

Other bad act evidence is admissible as evidence of intent if the conduct of a defendant can be viewed as either culpable or benign. State v. Mulero, 51 N.J. 224, 228 (1968). Here, defendant's intent when he "tickled" or "touched" the three complaining witnesses is at issue to negate the claim of an innocent intent. The court reasoned that this testimony was not admitted to show the defendant had a propensity to sexually molest girls. It was admitted to provide

the jury with evidence of intent and absence of mistake.  See State v. Cusick, 219 N.J. Super. 452, 464-65 (App. Div. 1987).

In Stevens, 115 N.J. at 293, a police officer was charged with official misconduct and criminal coercion after he conducted sexually motivated searches of two women in custody.  The trial court admitted evidence of three separate incidents where the defendant used his position as a police officer to intimidate female suspects into undressing and performing sexual favors as evidence of plan and intent.  Ibid. at 295-97.

Here, the trial court properly applied the Cofield test to allow the joinder of offenses involving three separate complaining witnesses.  The first Cofield prong was satisfied because the testimony of each witness was relevant to a material issue in dispute.  In both in his opening statement and closing argument, defense counsel maintained that any touching of these girls was nothing more than innocent tickling.  The State had the burden to prove, beyond a reasonable doubt, that defendant had a sexual motive and a purpose of sexual gratification as elements of the offenses charged.  Finally, the trial court properly found the complaining witnesses' testimony constituted relevant evidence of intent and absence of mistake, and was thus admissible under the fourth Cofield prong.

A-4422-16T4

The trial judge also properly exercised his discretionary authority to admit K.H.'s testimony concerning defendant's decision to purchase underwear for her from Victoria Secret and to admit the actual item as evidence in the trial. This young woman was a minor at the time this occurred. Although she is not a complaining witness in this case, the salacious nature of this garment reveals defendant's state of mind with respect to teenaged girls. Defendant's intent was a critically important part of both the State's case and defendant's defense.

As the trial judge explained in his decision to admit the evidence:

> With respect to the testimony regarding the alleged offer to buy underwear for [Kenzie] and allegedly actually buying it for [K.H.] . . . I believe this evidence is admissible under [N.J.R.E.] 404(b)[.]
>
> . . . .
>
> Again, I'll explain again why I'm admitting it. First, it is relevant in this [c]ourt's view as to a material issue in dispute. The primary issue in dispute is the defendant's intent [or] state of mind when he allegedly engaged in touching the alleged victims. There are three alleged victims in the case. I am limiting the jury's consideration of this evidence to his state of mind or intent when allegedly touching or making other remarks to [Kenzie]
>
> . . . .
>
> As previously noted, it is very clear that a . . . substantial aspect of the defense in this case is that any touching/tickling while possibly inappropriate was not

sexual; hence, this [c]ourt concludes that the alleged act of attempting to purchase underwear for [Kenzie], allegedly purchasing it for the second girl, . . . , is relevant in this case regarding his alleged state of mind and intent.

Second, the evidence proffered is certainly close in time, if not actually during the general time period when [Kenzie] alleges the actual touching was occurring. I would note also that the case law has indicated that this second prong is not even required. It's relevant if it's present, but the close in time is not even required, although I do believe it was close in time.

Third, this [c]ourt finds that the evidence presented as to this alleged incident is clear and convincing. I found [Kenzie] to be credible. And any judge has to make credibility findings during a pretrial hearing. I do my utmost to give both sides a fair trial. When [defendant] may have had concern that I make credibility findings, that's present in every case. It's completely up to the jury to make the ultimate determination.

Fourth, as to this evidence, I do conclude that the probative value, which I believe is significant, outweighs the prejudice of its admission. Any inculpatory evidence is prejudicial. The issue is, as the case law has defined it, would the [jurors] be so inflamed by its admission that they could not fairly consider all of the evidence in the case. I do not consider that in any way to be a consequence of admitting this evidence. So I will admit it for purposes only as to [Kenzie] and for purposes of evaluating his state of mind and intent when allegedly touching her or making other -- and/or making other remarks to her.

40

The trial court also gave detailed limiting instructions both before these witnesses testified and as a part of the general jury instructions.

## Summary

The now discredited CSAAS testimony provided by the State's expert witness had the capacity to bolster the complaining witnesses' credibility. We therefore reverse and remand this matter for a new trial. We reject defendant's remaining arguments related to the trial. Our decision obviates the need to reach defendant's argument related to the sentence imposed by the court.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION